

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2008 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RUDRA SABARATNAM and ESTILL MITTS,<br><br>Defendants. | CR No. **08-00904**<br><br>I N D I C T M E N T<br><br>[18 U.S.C. §§ 371 and 1349: Conspiracy to Receive and Pay Kickbacks for Patient Referrals, and to Commit Health Care Fraud; 42 U.S.C. § 1320a-7b(b)(1)(A): Receipt of Kickbacks for Patient Referrals; 42 U.S.C. § 1320a-7b(b)(2)(A): Payment of Kickbacks for Patient Referrals; 18 U.S.C. § 1956(a)(1)(A)(i): Money Laundering; 18 U.S.C. § 1957: Monetary Transactions in Criminally Derived Property; 26 U.S.C. § 7201: Tax Evasion; 18 U.S.C. § 2(b): Causing an Act to be Done] |

The Grand Jury charges:                    ~~UNDER SEAL~~

<u>COUNT ONE</u>

[18 U.S.C. §§ 371, 1349, and § 2(b)]

[Defendants Sabaratnam and Mitts]

A.   <u>INTRODUCTORY ALLEGATIONS</u>

At all times relevant to this Indictment:



The Defendants

1.  Defendant RUDRA SABARATNAM ("SABARATNAM") was a licensed physician and a resident of Los Angeles County, California.

2.  Defendant SABARATNAM was an owner and executive of Hospital #1, located in Los Angeles, California.

3.  Defendant ESTILL MITTS ("MITTS") was a resident of Los Angeles County, California.

4.  Defendant MITTS operated a facility called the Assessment Center, also known as 7th Street Christian Day Center, located at 431 East Seventh Street, Los Angeles, California, in the area commonly known as "Skid Row" ("the Assessment Center").

5.  Defendant MITTS was also the sole shareholder of Metropolitan Healthcare LLC ("Metropolitan") and Wilshire Healthcare Holdings LLC ("Wilshire"), both of which were located at the Central Plaza, 3440 Wilshire Boulevard, Suite 915, Los Angeles, California.

The Medicare Program

6.  Medicare was a federally funded national health care benefit program, affecting commerce, that provided reimbursement for health care services to the elderly and certain disabled persons.

7.  Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries."

8.  Medicare reimbursed hospitals, physicians, and other health care providers for medically necessary treatment and services rendered to beneficiaries.

9.  Medicare was administered through the United States Department of Health and Human Services, Centers for Medicare and

2

1 Medicaid Services ("CMS").  CMS administered the Medicare program
2 through contracts extended to private companies known as
3 Affiliated Contractors, also commonly referred to as Fiscal
4 Intermediaries ("FIs") and "Carriers."  The primary FIs for
5 hospitals operating in California were United Government Services
6 ("UGS") and Mutual of Omaha ("MO").

7     10.  Under Medicare, a provider of medical services would
8 first apply for a provider number, which would be used for the
9 processing and payment of claims.  Using its provider number, the
10 health care provider would bill Medicare for services provided to
11 eligible Medicare beneficiaries.

12     11.  Medicare claims would be submitted by the provider
13 through the mail or electronically.  Every claim submitted by or
14 on behalf of a provider would be submitted under an agreement by
15 the provider to abide by the program's rules and regulations.

16     12.  Medicare would reimburse providers only for services
17 and procedures that were deemed to be "medically necessary."

18     13.  In addition to being medically necessary, a
19 prescription or order by a physician was required for inpatient
20 hospital stays.

21     14.  Medicare Part A (Hospital Insurance) paid the operating
22 costs of hospital inpatient stays based on reimbursement rates
23 set prospectively by Medicare.  This payment system was referred
24 to as the inpatient prospective payment system ("IPPS").  Under
25 the IPPS, each case was categorized into a diagnosis-related
26 group ("DRG").  Each DRG had a payment weight assigned to it,
27 based on the average resources used to treat Medicare patients in
28 that DRG.

15.   Providers also received a portion of their Medicare Part A reimbursement through a second mechanism called a cost report.   A cost report was generated by the provider to attribute the portion of costs associated with its Medicare patients versus the total costs of the facility's operation.

16.   Medicare Part B (Medical Insurance) covered doctors' services, outpatient care, and certain other medical services not covered by Part A.

17.   Under Part B, Medicare generally reimbursed providers 80% of covered claims for medically necessary services according to fee schedules.   The remaining 20%, known as the co-payment, could be paid by a secondary insurance plan, by Medi-Cal, or by the patient.

<u>The Medi-Cal Program</u>

18.   Medi-Cal was a health care benefit program, affecting commerce, that provided reimbursement for health care services to indigent persons in California.   Funding for Medi-Cal was shared between the federal government and the State of California. Hospitals in California were generally reimbursed based upon a negotiated contract rate.

19.   The State of California, Department of Public Health (formerly called the California Department of Health Services) ("Cal DPH") administered the Medi-Cal program.   Cal DPH authorized provider participation, determined beneficiary eligibility, issued Medi-Cal cards to beneficiaries, and promulgated regulations for the administration of the program.

20.   Individuals who qualified for Medi-Cal benefits were referred to as "beneficiaries."

4

21.  Medi-Cal reimbursed hospitals, physicians, and other health care providers for medically necessary treatment and services rendered to beneficiaries.

22.  Health care providers would apply to Medi-Cal to receive unique provider numbers.  To obtain payment for services, an enrolled provider, using its unique provider number, would submit claims to Medi-Cal certifying that such services had been provided.

B.  OBJECTS OF THE CONSPIRACY

23.  Beginning no later than on or about August 20, 2004, and continuing to on or about October 10, 2007, in Los Angeles County and Orange County, within the Central District of California, and elsewhere, defendant SABARATNAM, defendant MITTS, Co-Conspirator Cooperating Witness ("CW"), and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to (a) execute a scheme to defraud Medicare and Medi-Cal, in violation of Title 18, United States Code, Section 1347; (b) receive kickbacks for patient referrals, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A)(b); and (c) pay kickbacks for patient referrals, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

C.  MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

24.  The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a.  Defendant MITTS established the Assessment Center in order to recruit homeless Medicare and Medi-Cal beneficiaries ("homeless beneficiaries") to receive unnecessary health

5

services.   Defendant MITTS hired CW and other persons, referred to as "stringers," to help recruit homeless beneficiaries on behalf of the Assessment Center.

   b.   As part of his or her job, CW used weekly checks provided by defendant MITTS to pay stringers and homeless beneficiaries.   These checks were referred to as "production."

   c.   Defendant MITTS and CW, acting at the direction of MITTS, paid stringers to recruit homeless beneficiaries for unnecessary health services.

   d.   Defendant MITTS, through the Assessment Center, referred the recruited homeless beneficiaries to Hospital #1 and other facilities for unnecessary health services.

   e.   Defendant MITTS and others working for him at the Assessment Center arranged to transport the recruited homeless beneficiaries from the Assessment Center to Hospital #1 and other facilities.

   f.   A medical doctor ("Physician #1") admitted to Hospital #1 the homeless beneficiaries who were referred to Hospital #1 by defendant MITTS.

   g.   Defendant SABARATNAM and others paid defendant MITTS for the referral of homeless beneficiaries to Hospital #1 by checks payable to defendant MITTS' companies, Metropolitan and Wilshire.

   h.   Defendant MITTS caused Metropolitan and Wilshire to execute sham "consultant" contracts with Hospital #1 and other facilities to conceal the fact that defendant SABARATNAM and others were making illegal kickback payments to defendant MITTS for the referral of homeless beneficiaries.

6

1       i.   Defendant MITTS created false "work reports"

2  pursuant to the sham contracts to disguise and justify such

3  illegal kickback payments.

4       j.   Hospital #1 and Physician #1, with the knowledge

5  and approval of defendant SABARATNAM, billed Medicare and Medi-

6  Cal for health services to the recruited homeless beneficiaries

7  that were unnecessary and, in some cases, not performed.

8       k.   Based on the fraudulent bills submitted and caused

9  to be submitted by defendant SABARATNAM and Physician #1,

10  Medicare and Medi-Cal paid Hospital #1 and Physician #1 for

11  unnecessary or non-existent health services.

12  D.   OVERT ACTS

13     25.  In furtherance of the conspiracy and to accomplish its

14  objects, defendant SABARATNAM, defendant MITTS, and others known

15  and unknown to the Grand Jury, committed and caused to be

16  committed the following overt acts, among others, within the

17  Central District of California, and elsewhere:

18     Overt Act No. 1:  In or about March 2004, defendant MITTS

19  executed an agreement to lease the Assessment Center commencing

20  on May 15, 2004.

21     Overt Act No. 2:  On or about August 20, 2004, defendants

22  SABARATNAM and MITTS executed a sham consultant contract between

23  Hospital #1 and Metropolitan.

24     Overt Act No. 3:  In or about July 2005, defendant MITTS

25  hired CW to work at the Assessment Center.

26     Overt Act No. 4:  On or about September 23, 2005, defendant

27  MITTS wrote a check (#1466), drawn on Wilshire's bank account,

28  payable to CW in the amount of $1,000, to be used to pay

1  stringers for recruiting homeless beneficiaries.

2       Overt Act No. 5:  On or about October 14, 2005, defendant

3  MITTS caused an invoice to be submitted to Hospital #1 on behalf

4  of Metropolitan seeking payment of $5,000.

5       Overt Act No. 6:  On or about October 21, 2005, defendant

6  SABARATNAM caused a check (#2447) to be issued, drawn on Hospital

7  #1's bank account, payable to Metropolitan in the amount of

8  $5,000, representing payment for the referral of homeless

9  beneficiaries to Hospital #1.

10      Overt Act No. 7:  On or about December 10, 2005, defendant

11  MITTS executed a sham consultant contract between Hospital #1 and

12  Wilshire.

13      Overt Act No. 8:  On or about December 9, 2005, defendant

14  MITTS caused an invoice to be submitted to Hospital #1 on behalf

15  of Metropolitan seeking payment of $9,300.

16      Overt Act No. 9:  On or about December 21, 2005, defendant

17  SABARATNAM caused a check (#3039) to be issued, drawn on Hospital

18  #1's bank account, payable to Metropolitan in the amount of

19  $9,300, representing payment for the referral of homeless

20  beneficiaries to Hospital #1.

21      Overt Act No. 10:  On or about December 30, 2005, defendant

22  MITTS caused an invoice to be submitted to Hospital #1 on behalf

23  of Metropolitan seeking payment of $11,100, to which he attached

24  a spreadsheet identifying the recruited beneficiaries, by name

25  and patient number, referred to Hospital #1 during the period

26  from December 4, 2005, through December 20, 2005.

27      Overt Act No. 11:  On or about March 20, 2006, defendant

28  MITTS caused an invoice to be submitted to Hospital #1 on behalf

of Wilshire seeking payment of $5,300, to which he attached a
false monthly work report to disguise and justify illegal
kickback payments for homeless beneficiaries recruited by
defendant MITTS.

Overt Act No. 12:  On or about March 30, 2006, defendant
SABARATNAM caused a check (#3777) to be issued, drawn on Hospital
#1's bank account, payable to Wilshire in the amount of $5,300,
representing payment for the referral of homeless beneficiaries
to Hospital #1.

Overt Act No. 13:  On or about May 15, 2006, defendant MITTS
wrote a check (#1735), drawn on Wilshire's bank account, payable
to CW in the amount of $1,100, to be used to pay stringers for
recruiting homeless beneficiaries.

Overt Act No. 14:  On or about August 22, 2006, defendant
MITTS caused an invoice to be submitted to Hospital #1 on behalf
of Wilshire seeking payment of $8,400.

Overt Act No. 15:  On or about August 24, 2006, defendant
SABARATNAM caused a check (#5138) to be issued, drawn on Hospital
#1's bank account, payable to Wilshire in the amount of $6,900,
representing payment for the referral of homeless beneficiaries
to Hospital #1.

Overt Act No. 16:  On or about October 4, 2006, defendant
MITTS caused an invoice to be submitted to Hospital #1 on behalf
of Wilshire seeking payment of $10,900, to which he attached a
false monthly work report to disguise and justify illegal
kickback payments for homeless beneficiaries recruited by
defendant MITTS, and a spreadsheet identifying the recruited
beneficiaries, by name and patient number, referred to Hospital

9

#1 during the period from September 14, 2006, through September 27, 2006.

Overt Act No. 17:  On or about October 9, 2006, defendant SABARATNAM caused a check (#5514) to be issued, drawn on Hospital #1's bank account, payable to Wilshire in the amount of $10,060, representing payment for the referral of homeless beneficiaries to Hospital #1.

Overt Act No. 18:  On or about November 29, 2006, defendant MITTS caused a spreadsheet to be submitted to Hospital #1 identifying recruited beneficiaries, by name and patient number, referred to Hospital #1 during the period from November 6, 2006, through November 20, 2006.

Overt Act No. 19:  On or about January 18, 2007, defendant MITTS caused an invoice to be submitted to Hospital #1 on behalf of Wilshire seeking payment of $14,600, to which he attached a spreadsheet identifying the recruited beneficiaries, by name and patient number, referred to Hospital #1 for the period from December 3, 2006, through January 18, 2007.

COUNTS TWO THROUGH FIVE

[42 U.S.C. § 1320a-7b(b)(2)(A)]

[Defendant Sabaratnam]

26.  The Grand Jury hereby repeats and realleges paragraphs 1 through 22 and 24 of this Indictment, as though fully set forth herein.

27.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant SABARATNAM, aided and abetted by others known and unknown to the Grand Jury, knowingly, willfully, and with knowledge that it was unlawful to do so, offered and paid remuneration, that is, checks drawn on Hospital #1's bank account, signed by defendant SABARATNAM in the approximate amounts set forth below, and payable to Mitts' company, Metropolitan, to induce Mitts to refer individuals to Hospital #1 for medical services for which payment could be made in whole and in part under a Federal health care program, namely, Medicare and Medi-Cal.

| COUNT | DATE | CHECK NUMBER | AMOUNT |
|-------|------|--------------|--------|
| TWO | 3/2/05 | #6517 | $800 |
| THREE | 4/29/05 | #7072 | $4,900 |
| FOUR | 10/21/05 | #2447 | $5,000 |
| FIVE | 12/21/05 | #3039 | $9,300 |

COUNTS SIX THROUGH NINE

[42 U.S.C. § 1320a-7b(b)(2)(A)]

[Defendant Sabaratnam]

28.  The Grand Jury hereby repeats and realleges paragraphs 1, 2, and 6 through 22 of this Indictment, as though fully set forth herein.

29.  In or about October 2006, defendant SABARATNAM agreed to pay CW for the referral of patients to Hospital #1.

30.  In or about November 2006, at the direction of defendant SABARATNAM, CW formed a company called Rolls-Cartier, LLC, and established a business bank account in the name of Rolls-Cartier, LLC, for the purpose of receiving illegal kickback payments for homeless patients recruited by CW.

31.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant SABARATNAM, aided and abetted by others known and unknown to the Grand Jury, knowingly, willfully, and with knowledge that it was unlawful to do so, offered and paid remuneration, that is, checks of the following entities signed by defendant SABARATNAM in the approximate amounts set forth below, payable to Rolls-Cartier, LLC, to induce CW to refer individuals to Hospital #1 for medical services for which payment could be made in whole and in part under a Federal health care program, namely, Medicare and Medi-Cal.

| COUNT | DATE | CHECK DESCRIPTION | AMOUNT |
|-------|------|-------------------|--------|
| SIX | 11/2/06 | 1711 Temple LLC check #3102 | $5,500 |

| SEVEN | 11/2/06 | Hellman Hospital, LLC check #1108 | $5,500 |
| EIGHT | 1/3/07 | Hospital #1 check #6171 | $7,200 |
| NINE | 3/7/07 | Hospital #1 check #6554 | $5,000 |

## COUNTS TEN THROUGH THIRTEEN

### [42 U.S.C. § 1320a-7b(b)(1)(A)]

### [Defendant Mitts]

32.   The Grand Jury hereby repeats and realleges paragraphs 1 through 22 and 24 of this Indictment, as though fully set forth herein.

33.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MITTS, aided and abetted by others known and unknown to the Grand Jury, knowingly, willfully, and with knowledge that it was unlawful to do so, solicited and received remuneration, that is, Hospital #1 checks signed by Sabaratnam in the approximate amounts set forth below, payable to defendant MITTS' company, Metropolitan, in return for referring individuals to Hospital #1 for medical services for which payment could be made in whole and in part under a Federal health care program, namely, Medicare and Medi-Cal.

| COUNT | DATE | CHECK NUMBER | AMOUNT |
|-------|------|--------------|--------|
| TEN | 3/2/05 | Check #6517 | $ 800 |
| ELEVEN | 4/29/05 | Check #7072 | $4,900 |
| TWELVE | 10/21/05 | Check #2447 | $5,000 |
| THIRTEEN | 12/21/05 | Check #3039 | $9,300 |

14

## COUNTS FOURTEEN THROUGH SEVENTEEN

[18 U.S.C. § 1956(a)(1)(A)(i)]

[Defendant Mitts]

34.   The Grand Jury hereby repeats and realleges paragraphs 1 through 22 and 24 of this Indictment, as though fully set forth herein.

35.   As used herein, "Specified Unlawful Activity" means any act or activity constituting an offense involving a Federal health care offense, namely, Conspiracy to Receive and Pay Kickbacks for Patient Referrals and to Commit Health Care Fraud, in violation of Title 18, United States Code, Sections 371, 1347, and 1349, as charged in Count One of this Indictment.

36.   On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MITTS, aided and abetted by others known and unknown to the Grand Jury, knowing that the property involved in each of the financial transactions described below represented the proceeds of some form of unlawful activity, conducted and willfully caused others to conduct the following financial transactions affecting interstate commerce, which transactions in fact involved the proceeds of Specified Unlawful Activity, with the intent to promote the carrying on of such specified unlawful activity:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FOURTEEN | 6/1/05 | Wilshire Healthcare Holdings LLC check #1330 signed by defendant MITTS, made payable to K.S. in the amount of $3,400, representing payment of Assessment Center rent for June 2005 and July 2005. |

15

| | | |
|---|---|---|
| FIFTEEN | 9/23/05 | Wilshire Healthcare Holdings LLC check #1466 signed by defendant MITTS, made payable to CW in the amount of $1,000, representing payment of "production money" used to recruit homeless Medicare and Medi-Cal beneficiaries at the Assessment Center. |
| SIXTEEN | 2/4/06 | Wilshire Healthcare Holdings LLC check #1620 signed by defendant MITTS, made payable to K.S. in the amount of $3,600, representing payment of Assessment Center rent for February 2006 and March 2006. |
| SEVENTEEN | 5/15/06 | Wilshire Healthcare Holdings LLC check #1735 signed by defendant MITTS, made payable to CW in the amount of $1,100, representing payment of "production money" used to recruit homeless Medicare and Medi-Cal beneficiaries at the Assessment Center. |

16

## COUNTS EIGHTEEN AND NINETEEN

[18 U.S.C. § 1957]

[Defendant Mitts]

37.  The Grand Jury hereby repeats and realleges paragraphs 1 through 22, 24, and 35 of this Indictment, as though fully set forth herein.

38.  On or about the following dates, in Los Angeles County, within the Central District of California, and elsewhere, defendant MITTS, knowing that the funds involved represented the proceeds of some form of unlawful activity, conducted and willfully caused others to conduct the following monetary transactions in criminally derived property of a value greater than $10,000, which property, in fact, was derived from Specified Unlawful Activity:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| EIGHTEEN | 6/6/05 | Electronic wire transfer of $21,386.14 from Wilshire Bank of America account number XXXXX-06809 to American Express, transaction reference #020051571166461. |
| NINETEEN | 2/7/06 | Electronic wire transfer of $12,687.83 from Wilshire Bank of America account number XXXXX-06809 to American Express, transaction reference #020060375896895. |

17

COUNT TWENTY

[26 U.S.C. § 7201; 18 U.S.C. § 2(b)]

[Defendant Mitts]

39.   The Grand Jury hereby repeats and realleges paragraphs 1 through 22 and paragraph 24 of this Indictment, as though fully set forth herein.

40.   During the calendar year 2005, in the Central District of California, and elsewhere, defendant MITTS had and received taxable income of at least $479,345, and upon that taxable income owed to the United States at least $151,965.

41.   Beginning in or about 2004, and continuing through in or about October 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendant MITTS did knowingly and willfully attempt to evade and defeat the assessment of a substantial part of the income tax due and owing by him to the United States of America for the calendar year 2005 through the following means, among others:

a.   Defendant MITTS failed to file with the Internal Revenue Service on or before April 17, 2006, an income tax return for the calendar year 2005, as he knew was required by law.

b.   While in the Central District of California, defendant MITTS directed and caused shell entities in the names of Metropolitan and Wilshire to be formed in the State of California.

c.   Defendant MITTS formed Metropolitan and Wilshire for the purpose of concealing and disguising his receipt of revenue from Sabaratnam, Hospital #1, and other facilities, in return for referring individuals to Hospital #1 and other

18

facilities for medical services for which payment could be made in whole and in part under a Federal health care program.

d.    At the direction of defendant MITTS, Sabaratnam, Hospital #1, and other facilities issued checks payable to Metropolitan and Wilshire.

e.    In or about April 2007, defendant MITTS misrepresented his income to his accountant and failed to disclose his receipt of revenue from Sabaratnam, Hospital #1, and other facilities, thereby causing the accountant to prepare a false and misleading draft U.S. individual income tax return for the year 2005.

<u>COUNT TWENTY-ONE</u>

[26 U.S.C. § 7201; 18 U.S.C. § 2(b)]

[Defendant Mitts]

42.  The Grand Jury hereby repeats and realleges paragraphs 1 through 22 and paragraph 24 of this Indictment, as though fully set forth herein.

43.  During the calendar year 2006, in the Central District of California, and elsewhere, defendant MITTS had and received taxable income of at least $620,907, and upon that taxable income owed to the United States at least $197,892.

44.  Beginning in or about 2004, and continuing through in or about October 2007, in Los Angeles County, within the Central District of California, and elsewhere, defendant MITTS did knowingly and willfully attempt to evade and defeat the assessment of a substantial part of the income tax due and owing by him to the United States of America for the calendar year 2006 through the following means, among others:

   a.  Defendant MITTS failed to file with the Internal Revenue Service on or before April 16, 2007, an income tax return for the calendar year 2006, as he knew was required by law.

   b.  While in the Central District of California, defendant MITTS directed and caused shell entities in the names of Metropolitan and Wilshire to be formed in the State of California.

   c.  Defendant MITTS formed Metropolitan and Wilshire for the purpose of concealing and disguising his receipt of revenue from Sabaratnam, Hospital #1, and other facilities, in return for referring individuals to Hospital #1 and other

20

facilities for medical services for which payment could be made in whole and in part under a Federal health care program.

d.   At the direction of defendant MITTS, Sabaratnam, Hospital #1, and other facilities issued checks payable to Metropolitan and Wilshire.

e.   In or about April 2007, defendant MITTS misrepresented his income to his accountant and failed to disclose his receipt of revenue from Sabaratnam, Hospital #1, and other facilities, thereby causing the accountant to prepare a false and misleading draft U.S. individual income tax return for the year 2005.

A TRUE BILL

/ S /
_____
Foreperson

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

DOUGLAS A. AXEL
Assistant United States Attorney
Chief, Major Frauds Section

BEONG-SOO KIM
Assistant United States Attorney
Deputy Chief, Major Frauds Section

CONSUELO S. WOODHEAD
Assistant United States Attorney
Senior Litigation Counsel
Major Frauds Section

VINCE FARHAT
Assistant United States Attorney
Major Frauds Section